THE STATE OF SOUTH CAROLINA

 THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
The State,       
Respondent,
 
 
 

v.

 
 
 
Willie James Simpson,       
Appellant.
 
 
 

Appeal From Lancaster County
J. Derham Cole, Circuit Court Judge

Unpublished Opinion No. 2003-UP-254
Heard June 19, 2002  Filed April 3, 
 2003

REVERSED and REMANDED

 
 
 
Assistant Appellate Defender Robert M. Dudek, of  
 Columbia, for appellant. 
Attorney General Henry Dargan McMaster, Chief Deputy 
 Attorney General John W. McIntosh, Attorney General Charles H. Richardson, Senior 
 Assistant Attorney General Harold M. Coombs, Jr., all of Columbia; and Solicitor 
 W. Townes Jones, IV, of Greenwood, for respondent. 
 
 
 

 SHULER, J.:  Willie James Simpson 
 was convicted of voluntary manslaughter and possession of a firearm during the 
 commission of a violent crime, and was sentenced to nine years imprisonment 
 for manslaughter and five years for the weapons charge.  Simpson appeals his 
 convictions, arguing the trial courts instructions to the jury were erroneous.  
 We reverse and remand for a new trial.  
 FACTS/PROCEDURAL HISTORY
On December 27, 1998, Anthony Sullivan 
 arrived at the All Good Club in Laurens County.  Willie James Simpson was one 
 of the clubs co-owners and operators.  According to witnesses, Sullivan argued 
 with the doorman upon entering the club and then again a few minutes later as 
 he exited.  Immediately thereafter, Sullivan retrieved a pistol, returned, and 
 kicked the clubs door in.  Apparently looking for someone, Sullivan screamed 
 at the patrons, who took cover.  Sullivan eventually went outside and fired 
 the weapon three times in the parking lot.     
Four days later, Sullivan appeared at 
 the club again and the doorman refused him entry.  A co-owner in the club, Robert 
 James Booker, came out and informed Sullivan he was not welcome on the premises.  
 Simpson appeared and told Sullivan a warrant had been issued for his arrest.  
 When Simpson asked him to leave, Sullivan shouted that he would come back 
 and shoot the club up again.  
Later that evening, Simpson left the 
 club to put his shotgun away in his pick-up truck.  While in the clubs parking 
 lot, Simpson observed Sullivan and Jimmy Lee Lindsay approach the club in Lindsays 
 truck.  The two drove by, then turned around and drove by again.  On the second 
 pass they yelled something at Simpson and Sullivan flashed a gun.  Albert Stokes, 
 a member of the clubs security team who was patrolling the lot at the time, 
 suggested that he and Simpson follow the men to see what they wanted.  
Simpson and Stokes began following Sullivan 
 and Lindsay, who twice pulled over to the side of the road.  After stopping 
 the second time, Lindsay exited the truck to speak with Stokes.  Sullivan remained 
 in the passenger seat and Simpson, armed with his shotgun, climbed into Lindsays 
 truck and told Sullivan to return to the club.  According to Simpson, Sullivan 
 attempted to pull the shotgun away from him.  Sullivan then got out and met 
 Simpson at the rear of the truck.  They argued, and Sullivan again grabbed the 
 shotgun.  As Simpson pulled it away, the gun discharged, fatally wounding Sullivan.   

Stokes and Simpson left the scene, though 
 Simpson turned himself in to police a short time later.  At that time, he gave 
 a statement recounting the evenings events.  In the statement, Simpson claimed 
 he was unaware Sullivan had been shot and declared he had not intended to kill 
 him.  
At trial, Simpson requested jury instructions 
 on the law of involuntary manslaughter and the defenses of accident and self-defense.  
 The trial court denied all three requests to charge.  The jury subsequently 
 convicted Simpson of voluntary manslaughter and unlawful possession of a firearm, 
 and was sentenced to nine years for voluntary manslaughter and five years for 
 the weapons charge.  This appeal followed.  
 LAW/ANALYSIS
I.  General Intent Charge
Simpson contends the trial court erred 
 in combining a general charge on criminal intent, including a definition of 
 criminal negligence, with the jury instructions on murder and voluntary manslaughter.  
 According to Simpson, this conflated charge created confusion as to the requisite 
 mental element required for conviction.  We agree.  
Immediately prior to defining murder 
 and voluntary manslaughter, the trial court instructed the jury as follows:  

Now, with regard to the allegation of the commission of an 
 unlawful homicide by the defendant, I charge you that it is not necessary . 
 . . that a specific intent to kill be proven by the evidence in the case, but 
 there must be shown beyond a reasonable doubt at least a general criminal intent 
 . . . .  Criminal intent is a mental state of conscious wrongdoing, and criminal 
 intent may be established by the proof of criminal negligence.  That is a mental 
 state indicating the defendants reckless disregard for the safety or rights 
 of others.  (emphasis added) 

The court repeated this portion of the charge when 
 the jury later asked for further instructions on the definitions of murder and 
 voluntary manslaughter.  At the same time, the court denied Simpsons requests 
 for a charge on involuntary manslaughter.  
The mens rea [1] required for involuntary manslaughter is defined 
 by statute.  Section 16-3-60 specifically states that [a] person charged with 
 the crime of involuntary manslaughter may be convicted only upon a showing of 
 criminal negligence, which is defined as the reckless disregard of 
 the safety of others.  S.C. Code Ann. § 16-3-60 (2003) (emphasis added); see 
 State v. Smith, 315 S.C. 547, 550, 446 S.E.2d 411, 413 (1994) ([T]o 
 constitute involuntary manslaughter, there must be a finding of criminal negligence, 
 statutorily defined as a reckless disregard of the safety of others.) (citation 
 omitted).  Thus, the trial court clearly instructed the jury on the mental element 
 of involuntary manslaughter.  
Whether stated as reckless disregard 
 for others safety or criminal negligence, this element signifies an indifference 
 to the consequences of ones acts.  It denotes a conscious failure to exercise 
 due care or ordinary care or a conscious indifference to the rights and safety 
 of others or a reckless disregard thereof.  State v. Rowell, 326 S.C. 
 313, 315, 487 S.E.2d 185, 186 (1997). 
On the other hand, the reckless conduct 
 giving rise to an inference of malice in depraved or malignant heart murder 
 is of an entirely different magnitude.  See State v. Watson, 349 
 S.C. 372, 376 n.5, 563 S.E.2d 336, 338 n.5 (2002) ([E]xtreme recklessness 
 can lead to an inference of malice.) (emphasis added); State v. Mouzon, 
 231 S.C. 655, 663, 99 S.E.2d 672, 676 (1957) (holding malice may be inferred 
 as when an act which imports danger to another is done so recklessly . . . 
 as to manifest depravity of mind and disregard of human life.) (citation omitted).
It is therefore readily apparent that 
 criminal negligence is a lesser mental state than that required to support a 
 conviction for voluntary manslaughter, and by analogy, murder.  See William 
 Shepard McAninch & W. Gaston Fairey, The Criminal Law of South Carolina 
 81-82 (3d ed. 1996) (Obviously this degree of recklessness [for depraved heart 
 murder] must involve more egregious conduct than th[e] reckless disregard of 
 the safety of others which is the statutory definition of the criminal negligence 
 predicate to an involuntary manslaughter prosecution.).  Accordingly, while 
 the trial court correctly stated that a showing of criminal negligence or reckless 
 disregard may establish criminal intent, we believe it was confusing, 
 and therefore erroneous, to combine this definition with those of murder and 
 voluntary manslaughter, both of which require the higher level of culpability, 
 or mens rea, of malice.   
II.  Involuntary Manslaughter Charge
Simpson also asserts error in the trial 
 courts refusal to instruct the jury on the lesser offense of involuntary manslaughter.  
 Again, we agree.   
A trial court should refuse to charge 
 a lesser-included offense only where there is no evidence the defendant committed 
 the lesser rather than the greater offense.  State v. Chatman, 336 S.C. 
 149, 152, 519 S.E.2d 100, 101 (1999); see State v. Burriss, 334 
 S.C. 256, 265, 513 S.E.2d 104, 109 (1999) (reiterating that to justify eliminating 
 offense of involuntary manslaughter it should very clearly appear that there 
 is no evidence whatsoever tending to reduce the crime from murder) (emphasis 
 in original).  In determining whether the evidence presented warrants a particular 
 manslaughter instruction, it must be viewed in a light most favorable to the 
 defendant.  State v. Gadsden, 314 S.C. 229, 233, 442 S.E.2d 594, 597 
 (1994).  
Involuntary manslaughter is the unintentional 
 killing of another without malice while one is either:  1) engaged in the commission 
 of some unlawful act not amounting to a felony and not naturally tending to 
 cause death or great bodily harm, or 2) acting lawfully with reckless disregard 
 of the safety of others. Burriss, 334 S.C. at 264-65, 513 S.E.2d at 109.  
 We believe the facts of this case fall within the latter definition of involuntary 
 manslaughter such that Simpson was entitled to have the jury instructed on this 
 offense.  
On direct examination, Simpson testified 
 he never intended to shoot Sullivan; to the contrary, he asserted he only wanted 
 to talk with him about not coming back to the club.  According to Simpson, he 
 carried the shotgun when  he approached Lindsays truck because he was afraid 
 Sullivan was liable to start shooting  both Simpson and Stokes stated that 
 Stokes observed a 9mm handgun in Sullivans waistband.  If this testimony is 
 believed, Simpson was acting lawfully if recklessly.  See Burriss, 
 334 S.C. at 260-61, 513 S.E.2d at 107 (stating principles of self-defense may 
 be relied upon in determining whether an accused was acting lawfully in the 
 context of involuntary manslaughter; court noted that in such a case it is the 
 right, not the law, of self-defense that is invoked).    
Moreover, Simpsons testimony confirmed 
 his written statement that the shotgun discharged when Sullivan grabbed the 
 barrel and pulled it in an attempt to take it from him.  These facts, viewed 
 in a light most favorable to Simpson, warranted a charge from the trial court 
 on involuntary manslaughter.  See State v. Patrick, 289 S.C. 301, 
 306, 345 S.E.2d 481, 484 (1986) (finding evidence necessitated charge on involuntary 
 manslaughter where defendant testified armed robbery victim, apparently thinking 
 [the defendant] was going to shoot him, grabbed the end of the barrel causing 
 [defendants] gun to fire; court held defendants testimony constituted a 
 sufficient ground for submitting the possible verdict of involuntary manslaughter 
 to the jury); State v. White, 253 S.C. 475, 478, 171 S.E.2d 712, 714 
 (1969) (stating negligent handling of a loaded gun that results in death may 
 support involuntary manslaughter).  
We therefore reverse Simpsons convictions 
 and remand for a new trial.  See Burriss, 334 S.C. at 263, 513 
 S.E.2d at 108 (The trial court commits reversible error if it fails to give 
 a requested charge on an issue raised by the evidence.). 
 [2]   
 REVERSED and REMANDED. 
 CURETON and STILWELL, JJ., concur. 
  

 
 
 [1] The state of mind that the prosecution, to secure a conviction, 
 must prove that a defendant had when committing a crime.  Blacks Law Dictionary 
 999 (7th ed. 1999).

 
 [2] Simpsons remaining issue on appeal concerns whether 
 the trial court erred in failing to instruct the jury that voluntary manslaughter 
 is the intentional killing of another.  Because we reverse, we decline to 
 reach this issue.