THIS OPINION HAS NO PRECEDENTIAL
 VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
 EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 
The State, Respondent, 
 
 
 

v.

 
 
 
 Shawn Antonio Miller, Appellant.
 
 
 

Appeal From Spartanburg County
Roger L. Couch, Circuit Court Judge

Opinion No. 2012-UP-691
 Heard February 16, 2012 – Filed April 25,
2012 

REVERSED AND REMANDED

 
 
 
 Appellate Defender Breen Richard Stevens,
 of Columbia, for Appellant.
 Attorney General Alan Wilson, Chief Deputy
 Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General
 Salley W. Elliott, and Assistant Deputy Attorney General Donald J. Zelenka, all
 of Columbia; and Solicitor Barry J. Barnette, of Spartanburg, for Respondent.  
 
 
 

CURETON, A.J.:  Shawn
 Antonio Miller appeals his convictions and sentences for murder and the
 possession of a firearm during the commission of a violent crime, arguing the trial court erred in instructing the jury it could
 infer malice from the use of a deadly weapon, despite the presentation of
 evidence that would mitigate or reduce the offense.  We reverse and remand for a new trial.  
FACTS
On October 26, 2007, Miller and his
 friend, Christopher Blount, visited a crack house.  At some point, Miller
 indicated he was ready to leave.  When Blount refused to leave, Miller produced
 a handgun, which discharged.  Blount was hit in the abdomen and later died. 
 Miller was indicted and tried for murder and the possession of a firearm during
 the commission of a violent crime.[1]    
At Miller's trial, the State presented
 Tammy Hunter, who testified she was at the house when Blount and Miller arrived
 together.  Hunter recalled approximately seven people were at the house,
 talking and joking.  She stated Miller brought crack cocaine and marijuana,
 which he shared with the group.  Miller sat down at the kitchen table, and
 Blount sat next to Hunter on the couch.  Hunter testified she, Miller, and
 Blount smoked the drugs Miller had brought.  Approximately forty minutes after
 Miller and Blount arrived, Hunter watched Miller point a black revolver at Blount and
 tell him to "get his bitch ass up."[2] 
 According to Hunter, Miller repeated his order, and the gun went off.  She
 remembered Miller screaming and saying "y'all know I didn't mean to shoot
 him" before he left the home with another man.  Hunter and another person
 fled into the woods.  The police questioned Hunter the next day, and she
 identified Miller as the shooter.  
Joseph "Chick" Hopkins, another
 eyewitness, testified he sat next to Miller at the kitchen table.  Hopkins watched
 Miller playing with the revolver, removing bullets, "like somebody that
 got a brand new toy," and he advised Miller three or four times to put the
 gun away.  He described Miller as "happy" but characterized his
 handling of the gun as careless and reckless.  According to Hopkins, just after
 Miller announced he was ready to leave and told Blount to get up, Miller
 "waved" the gun in Blount's direction and it fired.[3]  Hopkins believed the shooting was
 unintentional.  He remembered Miller appeared stunned by the gunshot.    
Law enforcement officials testified they identified
 Miller as a suspect and eventually found him hiding in a friend's apartment. 
 One of the arresting officers testified Miller was carrying a loaded revolver
 in a hip holster at the time of his arrest.[4] 
 After a brief interview, Miller signed a statement that he was not at the house
 where the incident occurred, did not know anyone who lived in that area, and did not shoot anyone.  
After the close of evidence, Miller requested jury instructions
 on accident and involuntary manslaughter as a lesser included offense of murder. 
 Miller asserted the testimony that the shooting appeared unintentional
 supported an accident instruction.  The trial court declined to charge
 accident, finding the record contained no evidence that Miller was acting
 lawfully or handling the weapon with reasonable care.  However, it found
 sufficient evidence to charge the jury on involuntary manslaughter.  In its
 closing, the State noted the jury could infer malice from the use of a deadly
 weapon and argued, "Ladies and gentlemen, it's right here in State's no.
 17, a .38 caliber Smith and Wesson pistol, malice."  
The trial court instructed the jury that murder
 requires malice aforethought, which may be either express or implied, and the
 jury could infer malice:[5]
[F]rom conduct showing a total disregard for human
 life.  Inferred malice may also arise when the deed is done with a deadly
 weapon.  
Now, a deadly weapon is any article or instrument or
 substance which is likely to cause death or great bodily harm.  Now, whether an
 instrument has been used in any particular case as a deadly weapon will depend
 upon the facts and circumstances of each case.  . . . [A] gun can even be a
 deadly weapon[], even if it's not operating, if it's used in a certain
 fashion.  
Miller
 objected to this instruction, arguing it could "be construed as a comment
 on the facts of the case, and invade the province of the jury."  The trial
 court declined to modify the instruction.  
During deliberations, the jury requested
 re-instruction on the charges of murder, involuntary manslaughter, and
 possession of a weapon during the commission of a violent crime.  The trial
 court furnished the jury with a written copy of the instructions.  Miller
 objected to the recharge.  The State did not object, either after the initial
 jury charge or after the recharge.
The jury found Miller guilty of murder and the possession of a firearm during the commission of a
 violent crime.  He received concurrent sentences of forty years' imprisonment
 for murder and five years' imprisonment for possession of a firearm.  This
 appeal followed.  
STANDARD OF REVIEW
In criminal cases, appellate courts review only errors
 of law and will not reverse a trial court's decision concerning jury
 instructions unless the trial court abused its discretion.  State v. Kinard,
 373 S.C. 500, 503, 646 S.E.2d 168, 169 (Ct. App. 2007).  "An abuse of
 discretion occurs when the [trial] court's decision is unsupported by the
 evidence or controlled by an error of law."  State v. Garris, 394
 S.C. 336, 344, 714 S.E.2d 888, 893 (Ct. App. 2011).  
LAW/ANALYSIS
Miller contends the trial court's instruction to the
 jury that it could infer malice from the use of a deadly weapon was reversible
 error in view of evidence that would mitigate or reduce the offense.  We
 agree.  
"In general, the trial court is required to
 charge only the current and correct law of South Carolina."  Sheppard
 v. State, 357 S.C. 646, 665, 594 S.E.2d 462, 472 (2004).  "To warrant
 reversal, a trial judge's refusal to give a requested jury charge must be both erroneous
 and prejudicial to the defendant."  State v. Brown, 362 S.C. 258,
 262, 607 S.E.2d 93, 95 (Ct. App. 2004).  "In reviewing jury charges
 for error, we must consider the [trial] court's jury charge as a whole in light
 of the evidence and issues presented at trial."  State v. Adkins,
 353 S.C. 312, 318, 577 S.E.2d 460, 463 (Ct. App. 2003).
South Carolina law defines
 "murder" as "the killing of any person with malice aforethought,
 either express or implied."  S.C. Code Ann. § 16-3-10 (2003). 
 Historically, the use of a deadly weapon in a killing created first a
 presumption, and later a permissive inference, of malice aforethought.  State v. Belcher, 385 S.C. 597, 602-08, 685 S.E.2d 802, 804-08 (2009).  However,
 currently, "the 'use of a deadly weapon' implied malice instruction has no
 place in a murder . . . prosecution where evidence is presented that would
 reduce, mitigate, excuse or justify the killing . . . ."  Id. at
 610, 685 S.E.2d at 809.  Noting this decision "represent[ed] a clear break
 from our modern precedent," the Belcher court held it would apply
 to "all cases which [we]re pending on direct review or not yet final where
 the issue is preserved."  Id. at 612, 685 S.E.2d at 810.  
Initially, we note the State argues unpersuasively that
 this issue is unpreserved for appellate review.  "For an objection to be
 preserved for appellate review, the objection must be made at the time the
 evidence is presented . . . and with sufficient specificity to inform the
 circuit court judge of the point being urged by the objector."  State
 v. Byers, 392 S.C. 438, 444, 710 S.E.2d 55, 58 (2011).  "Error
 preservation rules do not require a party to use the exact name of a legal
 doctrine in order to preserve an issue for appellate review."  State v.
 Brannon, 388 S.C. 498, 502, 697 S.E.2d 593, 595 (2010).  Here, Miller
 acknowledged the challenged language was "probably in the standard
 charge" but objected that the jury might construe the inferred malice
 instruction as a judicial commentary on the facts of the case.  The trial judge
 indicated he understood the objection, and Miller did not elaborate further. 
 The State argues Miller objected purely on a constitutional basis.   See S.C. Const. art. V, § 21 ("Judges shall not charge juries in respect to matters
 of fact, but shall declare the law.").  The record does not support this argument:
 the trial court clearly charged the law, only, and Miller's objection addressed
 the likelihood that this charge would prejudice the jury.  Accordingly, we find
 this issue is preserved.[6]  
Turning to the merits, we find this appeal was pending
 when our supreme court decided Belcher; therefore, Belcher applies.  See Belcher, 385 S.C. at 612, 685 S.E.2d at 810
 (holding Belcher applies to "all cases which are pending on direct
 review or not yet final where the issue is preserved").  This court must
 evaluate the evidence adduced at trial to determine whether any of it "would
 reduce, mitigate, excuse or justify the killing."  Id. at 610, 685
 S.E.2d at 809; Adkins, 353 S.C. at 318, 577 S.E.2d at 463 ("In
 reviewing jury charges for error, we must consider the [trial] court's jury
 charge as a whole in light of the evidence and issues presented at trial."
 (citations omitted)).  
We note that if the trial court properly charged
 involuntary manslaughter, the evidence supporting that charge would
 "reduce [or] mitigate" the charge of murder and, thus, under Belcher the malice inference charge was improper.  The State argues, however, that
 because Miller was acting unlawfully while waving the gun, he was not entitled
 to the charge on the lesser offense.  See State v. Cabrera-Pena,
 361 S.C. 372, 381, 605 S.E.2d 522, 526 (2004) (recognizing an involuntary
 manslaughter instruction would have been improper because the accused was
 "engaged in unlawful, felonious and harmful conduct" at the time of
 the incident).  We find it unnecessary to resolve this dispute, because we find
 there is evidence that mitigates the charge of murder even if Miller acted
 unlawfully.  
We arrive at this conclusion after reviewing State
 v. Byrd, 72 S.C. 104, 51 S.E. 542 (1905), one of the cases specifically
 overruled by Belcher.  Belcher, 385 S.C. at 610, 612 n.10, 685
 S.E.2d at 809, 810 n.10.  Byrd faced a murder charge for the killing of William
 J. Cox, a magistrate.  Byrd, 72 S.C. at 105-06, 51 S.E. at 542. 
 Believing covered items in Byrd's buggy to be illegal liquor, Cox and B. M.
 Austin attempted to arrest Byrd and his companion.  Id. at 106, 51 S.E.
 at 542.  Cox and Austin stopped the men but found them armed, and Austin drew
 his gun.  Id.  As Austin chased the other man, Cox pursued Byrd and was
 shot and killed.  Id.  While Cox never identified himself as an officer
 of the law, evidence existed that suggested Byrd lived in the next county and,
 being "not unfamiliar with the country and its inhabitants," may have
 known Cox was a magistrate.  Id. at 106, 51 S.E. at 542-43.  The Byrd court observed an arresting officer has a duty to identify himself as an
 officer of the law and state the reason for the arrest.  Id. at 107, 51
 S.E. at 543.  However, "the [officer's] failure to take these precautions
 does not justify homicide or even physical resistance by the party arrested,
 without inquiry on his part as to the authority for his arrest."  Id. 
 The Byrd court affirmed the jury instruction that "[t]he use of a
 deadly weapon presumes malice, but the presumption may be rebutted.  So, after
 all, it is left for the jury to say, from all the facts and circumstances,
 whether the killing was done with malice, or not."  Id. at 110, 51
 S.E. at 544.  In overruling Byrd, the Belcher court observed the Byrd court "approved of the [malice] charge even with evidence of mitigation."  Belcher, 385 S.C. at 606, 685 S.E.2d at 806.  
We find Miller's case is similar to Byrd's, in that
 evidence of mitigation exists that renders the inferred malice instruction
 improper.  Here, the State presented evidence that there were no ill feelings
 between Miller and Blount and Miller exhibited surprise and panic when the gun
 discharged.  Eyewitnesses Hopkins and Hunter testified they saw no animosity or
 argument between Miller and Blount.[7] 
 Hopkins described Miller playing with the gun and showing it off like a toy
 shortly before deciding to leave.  Although Hunter testified Miller instructed
 Blount to get his "bitch ass" or "punk ass" up so they
 could leave, Hopkins explained the phrasing was "just an expression"
 and did not indicate Miller was angry with Blount.  Remembering Miller being as
 "surprised as anyone" when the gun went off, Hopkins attested he was
 certain Miller did not intend to shoot Blount.  In addition, Hunter recalled
 Miller screaming "y'all know I didn't mean to shoot him, y'all know I
 didn't mean to shoot him" immediately after the gun discharged.  Aside
 from Hunter's recollection of the way Miller informed Blount he was ready to
 leave, the State presented no evidence of discord or ill will between the men.  
We find no way to distinguish Byrd and Belcher.  Belcher forbids the inferred malice charge when there is evidence of
 mitigation and overruled Byrd as having "evidence of
 mitigation" despite Byrd's illegal conduct, which was similar to Miller's
 conduct in this case.  Accordingly, the trial court erred in instructing the
 jury that it could infer malice from Miller's use of a deadly weapon.  
Finally, the State unpersuasively contends any error
 was harmless.[8] 
 The Belcher court confronted this issue as well:  
Errors, including erroneous jury instructions, are
 subject to harmless error analysis.  In many murder prosecutions, . . . there
 will be overwhelming evidence of malice apart from the use of a deadly weapon. 
 Here, however, the error in charging that malice may be inferred by the use of
 a deadly weapon cannot be considered harmless.  Evidence of self-defense was
 presented, thereby highlighting the prejudice resulting from the charge.  It is
 entirely conceivable that the only evidence of malice was Belcher's use of a
 handgun.  We need go no further than saying we cannot conclude the error was
 harmless beyond a reasonable doubt.
Id. at 611-12, 685 S.E.2d at 809-10 (citations omitted). 
 In the case at bar, Miller did not assert self-defense, but the State also
 failed to present "overwhelming evidence of malice" apart from the
 use of a gun.  Consequently, here, as in Belcher, the instruction that
 the jury could infer malice from the use of a gun may have been the jury's sole
 basis for finding malice and convicting Miller of murder.  In this
 circumstance, the error in giving this jury instruction was not harmless.  
CONCLUSION
We find the appeal in this case was pending at the
 time our supreme court decided Belcher.  Consequently, a Belcher analysis is appropriate.  
We further find evidence Miller acted with malice in
 shooting Blount is either limited or nonexistent and mitigating evidence was presented
 at trial.  Accordingly, we reverse the trial court's decision to instruct the
 jury it could infer malice from the use of a deadly weapon in this case, and we
 remand for a new trial.   
REVERSED AND REMANDED.
FEW, C.J., concurs.  
PIEPER, J., concurring:  I concur with the majority but also write
 separately because I believe the involuntary manslaughter charge was warranted
 by the evidence presented at trial.  "If there is any evidence warranting
 a charge on involuntary manslaughter, then the charge must be given." State
 v. Wharton, 381 S.C. 209, 216, 672 S.E.2d 786, 789 (2009) (citation
 omitted).  "Involuntary manslaughter is defined as: (1) the unintentional
 killing of another without malice, but while engaged in an unlawful activity
 not naturally tending to cause death or great bodily harm; or (2) the
 unintentional killing of another without malice, while engaged in a lawful
 activity with reckless disregard for the safety of others." State v.
 Rivera, 389 S.C. 399, 404, 699 S.E.2d 157, 159 (2010) (citation omitted). 
 "It is unlawful for a person to present or point at another person a
 loaded or unloaded firearm." S.C. Code Ann. § 16-23-410 (2003). 
 Presenting a weapon means "to offer to view in a threatening manner, or to
 show in a threatening manner."  In re Spencer R., 387 S.C.
 517, 522-23, 692 S.E.2d 569, 572 (Ct. App. 2010).  
Evidence was presented at trial that Miller was acting
 lawfully with reckless disregard for the safety of others. Witness Joseph
 Hopkins testified that prior to shooting Blount, Miller had been
 sitting at the table and playing with the gun "like somebody that got a
 brand new toy."  Hopkins also testified that when Miller was ready to
 leave, Miller told Blount he needed "to bring your little punk self
 on."  Hopkins testified Miller did not sound mean and that "get your
 punk self on" is just an expression that means "come on, let’s
 go."  When asked whether Miller pointed the gun at Blount, Hopkins
 replied:
Not really.  It was just like a wave . . . .  Like if
 I wave something this way, but you wasn't in the line of fire . . . .  I'm not
 just putting that in your face and telling you to come on.  No, it wasn't like
 that . . . it was just like a little wave.
Additionally, Hopkins testified that immediately prior
 to the shooting "[Miller] was happy," "everything was all
 right," and "it was . . . a social gathering, everybody sitting
 around kicking it."  While witness Tammy Hunter testified that Miller
 pointed the gun at Blount and told him to get his "bitch ass up,"
 Hunter also testified that there were no arguments, altercations, or harsh
 feelings amongst anyone in the room.  Additionally, Hunter testified that there
 had been no arguments between Miller and Blount and that they seemed like they
 were friends.
 Based on the foregoing, evidence was presented that
 Miller was acting lawfully because his 'waving' or 'showing' a gun at Blount
 was not in a threatening manner that constitutes presenting a firearm.  This
 evidence, depending on the view of the jury, could reduce the homicide from
 murder to involuntary manslaughter.  Since a jury question existed as to
 whether the gun was pointed or presented in an unlawful manner, as opposed to
 merely recklessly waving it in the air in a nonthreatening manner, the trial
 court's implied malice instruction was error. See State v. Belcher,
 385 S.C. 597, 611, 685 S.E.2d 802, 809 (2009) ("[I]nstructing a jury that
 'malice may be inferred by the use of a deadly weapon' is confusing and
 prejudicial where evidence is presented that would reduce, mitigate, excuse or
 justify the homicide."). 

[1] The indictment specified the violent crime was murder.  
[2] Hunter's statement to police indicated Miller told Blount to get his "punk
 ass" up.  At trial, Hunter testified she considered the terms to be
 interchangeable.    
[3] The State capitalized on Hopkins's use of the word "pointed" in his
 statement to police.  Hopkins explained he considered pointing and waving the
 gun to be "the same type of gesture."    
[4] Ballistics testing could not exclude this gun as the one that killed Blount. 
 Additional testing on the gun demonstrated that, although
 the firing mechanism appeared damaged, the safety block nonetheless prevented
 the weapon from firing unless the trigger was pulled fully.  
[5] The trial court's charge did not include the qualifying language set forth in State
 v. Elmore, 279 S.C. 417, 421, 308 S.E.2d 781, 784 (1983), overruled on
 other grounds by State v. Torrence, 305 S.C. 45, 69 n.5, 406 S.E.2d
 315, 328 n.5 (1991): "this inference would be simply an evidentiary fact
 to be taken into consideration by you, the jury, along with other evidence in
 the case, and you may give it such weight as you determine it should
 receive."  
[6] Similarly, the Belcher court recalled that the trial court had
 "expressed 'concern about [the charge] rising to a charge on the
 facts.'"  385 S.C. at 602, 685 S.E.2d at 804.  Nonetheless, the Belcher court elected to decide the matter based on common law.   Id.
[7] Both witnesses had charges pending against them and testified for the State in
 order to have their own charges reduced.  Nonetheless, both witnesses refused
 to concede Miller intended to shoot Blount.
[8] The State argues the involuntary manslaughter charge was inappropriate because
 the evidence presented did not support it.  Thus, the State reasons, any error
 in the inference of malice charge was harmless.  The State further contends
 that, inasmuch as Miller was not entitled to an involuntary manslaughter
 charge, he could only have been convicted of murder.  We note the jury might
 have found Miller not guilty of any crime.  However, because we find the
 inference of malice charge was improper due to the presentation of evidence of
 mitigation, we need not further address the State's argument that Miller's
 murder charge was not subject to reduction.